[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION FOR SUMMARY JUDGMENT
The plaintiffs, as lease holders of shellfish beds in Long Island Sound, have instituted the present action seeking damages, on various legal theories from the defendant as a result of the construction of a natural gas transmission line from Connecticut to Long Island. As a condition to the permission to erect the natural gas transmission line, the defendant was required, by the Connecticut Department of Environmental Protection, to financially reimburse the plaintiffs, and others similarly situated, for the market value of the resource impacted by the construction.
The plaintiffs, respectively, and the defendant entered, as of March 1, 1991, a "Full and Final Settlement Agreement" (the "Agreement") which provided for a monetary payment to the plaintiffs and stated, in part:
 "(Plaintiff) hereby consents and agree that for the period of the construction of the natural gas pipeline, which shall not exceed twelve (12) months in duration (the "Construction Period"). (sic.) (Plaintiff) will not make any use of the temporary "Work Area" to be used by (defendant). Said Work Area with that portion of the shellfish CT Page 2231 grounds within one hundred (100) feet on either side of the intended location of the pipeline, as shown on Schedule A hereto."
 The agreement between the parties further provided that the plaintiff would not make any use of the Work Area during the construction period, including without limit, the seeding, cultivation or harvesting of shellfish therein, but the plaintiff retained the right "to seed, cultivate or harvest shellfish and oyster cultch in the portion of the Grounds outside the Work Area, during the construction period so long as such activity does not in any way interfere with the pipeline construction."
The plaintiffs assert that, when they were contacted by the defendant with respect to compensation, they advised the defendant's agent that they were unable to discuss damages until they were advised of the manner, nature and extent of the construction of the pipeline. The plaintiffs further assert that the parties acknowledged that total destruction of shellfish would occur in the Work Area and that there would be incidental damage outside of the Work Area. The plaintiffs also assert that they were told by the defendant that the construction of the pipeline would encompass a 200 foot area, one hundred feet on either side of the pipeline trench. The plaintiffs assert that the compensation paid to them was determined by a mathematical formula based on the length of the pipeline through the plaintiff's leasehold and the 200 foot work area in order to ascertain the number of acres. The acreage figure was then multiplied by 1,500 which represents the bushels of oysters per acre multiplied by the then market value of the oysters, $55 per bushel. That figure was then doubled to cover the incidental damage outside of the 200 foot area.
The affidavits filed by the plaintiffs state that, following the execution of the Agreement and the commencement of construction, they became aware that the defendant's contractors were working outside of the 200 foot area and that the work area as defined in the defendant's contracts with its contractors was a 300 foot work corridor not a 200 foot work corridor as represented to the plaintiffs. The plaintiffs further state that had they known, that the defendant intended to utilize a 300 foot work area, rather than a 200 foot work area, they would not have agreed to the compensation paid by the defendant and that the CT Page 2232 defendant fraudulently misrepresented the work area to them.
The defendant has now moved for a summary judgment claiming that the Agreement contains a complete release of the defendant by the plaintiffs of all damages with respect to any damage to any shellfish grounds incident to the construction of the natural gas transmission line. Defendants therefore claim that the plaintiffs are not entitled to damages because they have not claimed, and specifically have disavowed, the remedy of rescission. Defendant also claims to be entitled to a summary judgment on the grounds that the plaintiff Tallmadge after learning of the alleged actionable conduct of the defendant, entered into a second agreement which ratified the release. The defendant further claims to be entitled to a summary judgment on the grounds that the parol evidence rule bars the plaintiffs' claims on the ground that the Agreement does not restrict the defendant to the 200 foot strip and the Agreement releases all the claims for damages whether inside or outside of the 200 foot strip.
The defendant claims that the failure of the plaintiffs to seek the remedy of rescission, and the specific disavowal of that remedy bar the plaintiffs from seeking monetary damages. It is true that a party cannot accept the benefits of an agreement and escape the obligations of that agreement if the parties can be returned to the status quo. Grillet v. Sears Roebuck and Co,927 F.2d 217 (5th Cir. 1991). However, in certain situations a party may affirm the transaction and sue in deceit. Billotti v. Acura Co., 188 A.2d 24 (N.J. 1963). See also Pavia v. Vanech Construction Co, 159 Conn. 512 (1970). (The purchaser of a dwelling may seek recovery for fraud of the defendant in representing that only one family homes would be built on a lot in the subdivision where the plaintiffs claimed damages for the diminution in the market value of their homes).
The defendant relies upon Pacelli Bros. Transportation. Inc. v. Pacelli, 189 Conn. 401 (1983) where the court held that the failure of the plaintiffs to seek rescission of an agreement to release claims barred recovery for subsequently discovered fraud claims. The court based its decision on the fact that the settlement was indivisible and therefore the plaintiffs could not avoid the detriment of the settlement without relinquishing its benefits. However, in reaching that conclusion the court stated, at p. 410: "Since the plaintiffs have elected to seek damages rather than rescission, they bear the burden of proving the amount of diminution in the value of their bargain which was suffered CT Page 2233 because of the nondisclosure." Thus the Pacelli case does not hold that rescission must be claimed in all cases before a claim for damages can be asserted.
"Rescission, simply stated, is the unmaking of a contract. It is the renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed prior to the execution of the contract. A condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible." Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 299 (1984). In the present case, the plaintiff could return the consideration they received but they could not be restored to the status quo as it existed prior to the Agreement because the undisturbed shellfish beds could not be restored to them. Accordingly, the failure to claim rescission is not a bar to their claim for damages.
The defendant also claims that the agreement does not restrict the defendant to the 200 foot strip and releases claims for damages within and without the 200 foot strip. The agreement does provide for the defendant's exclusive use of the 200 foot work area during the period of construction and provides that the plaintiff will not make any use of such area during that period. It also provides that the plaintiff shall have "the right to seed, cultivate or harvest shellfish" outside of the work area. The plaintiff claims that the defendant knew, at the time the agreement was entered, that the work area would actually constitute a 300 foot wide strip. Plaintiff also claims the parties knew and understood that there would be complete destruction of the shellfish beds within the work area and incidental damage outside of that area. The benefit to the plaintiffs of the right "to seed, cultivate and harvest shellfish" from an area that would be completely destroyed may be questionable. Under such circumstances, evidence is admissible to determine whether the parties intended that the release encompassed a work area to be comprised a 200 foot strip referred to in the agreement as claimed by the plaintiffs or whether was intended to encompass whatever area was necessary for the completion of the project. Accordingly, there is no rule of law which prevents the plaintiffs from submitting evidence to support the claims asserted.
The defendant also claims that after the completion of the construction of the pipeline, the defendant Tallmadge executed, as of March 27, 1992, an Assignment and Acknowledgment (the "second agreement") which ratified the prior Agreement. The defendant claims that the assignment and acknowledgment is supported by CT Page 2234 separate consideration and ratified the prior agreement at a time when the plaintiff Tallmadge had knowledge of the facts upon which the present claim is based.
The Agreement, executed by the parties as of March 1, 1991, contained a provision which stated:
 "3. Iroquois is obligated by a permit condition imposed by the State of Connecticut, Department of Environmental Protection (DEP), to restore all disturbed oyster grounds (including those of others) after construction of the Pipeline. To comply with this condition, Iroquois will purchase oyster cultch as pre-approved by Tallmadge and the State of Connecticut, Department of Agriculture, Aquaculture Division and transport the same at its sole cost and expense to that Connecticut location designated by Tallmadge situated within the vicinity of the affected shellfish grounds. Iroquois agrees to retain Tallmadge to unload, store and spread such cultch to comply with permit condition, and Tallmadge agrees to do so. Iroquois will pay Tallmadge $525,000 for this work upon receipt of the notices from: a) Tallmadge; and b) the State of Connecticut, Department of Agriculture, Aquaculture Division that the grounds have been restored to their satisfaction."
In March of 1992, Tallmadge and the defendants executed the second agreement which acknowledges that the restoration work required under the permit issued by the DEP had been performed and that the defendant shall pay the $525,000 due to Tallmadge, under the second agreement, to the State of Connecticut and that such payment would satisfy all obligations of Iroquois to Tallmadge; pursuant to the Agreement. The second agreement then provides that: "(The) parties hereto further agree that, except as amended above, their agreement of March 1991 is ratified, confirmed and continued in all respects."
The defendant claims that the execution of the Assignment and Acknowledgment constitutes ratification as a matter of law disentitling the plaintiff to maintain a cause of action for damages. The plaintiff Tallmadge on the other hand claims that there was no intent to ratify the fraud and it was merely performing its contractual obligations. CT Page 2235
Under the March 1991 Agreement the defendant was obligated to restore the disturbed oyster grounds and agreed to pay Tallmadge to unload, store and spread the cultch. Defendant was obligated to pay Tallmadge upon certification from Tallmadge and the State of Connecticut that the grounds have been restored to their satisfaction. The second agreement can be viewed as simply satisfying the obligations of the respective parties regarding to the restoration of the shellfish beds and is not necessarily inconsistent with the claims made by the plaintiff in the present action. As a general rule, the performance of a partly performed contract after discovery of fraud does not operate as a relinquishment of a claim of damages. See annotation 13 A.L.R.2d 807 (1950) and later case serviced; see also, Dwyer v. Richmond,103 Conn. 37, 247-48 (1925). The court cannot conclude as a matter of law that the execution and performance of the second agreement constitutes a waiver or ratification of the claims asserted by the plaintiff Tallmadge.
Accordingly, the motion for summary judgment is denied.
RUSH, J.